IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

```
UNITED STATES OF AMERICA     )
                             )     CRIMINAL ACTION NO.
        v.                   )        2:20cr137-MHT
                             )           (WO)
D'LIVRO LEMAT BEAUCHAMP      )

UNITED STATES OF AMERICA     )
                             )     CRIMINAL ACTION NO.
        v.                   )        2:20cr146-MHT
                             )           (WO)
DEANDRE VARNEL GROSS         )

UNITED STATES OF AMERICA     )
                             )     CRIMINAL ACTION NO.
        v.                   )        2:21cr190-MHT
                             )           (WO)
MAURICE DAUGHTRY,            )
THOMAS LEE JAMES, JR.,       )
NAAMAN RASHAD JACKSON,       )
KENNETH JAMES KEITH, and     )
SHAYLA DENISE MOORER         )
```

OPINION AND ORDER

These cases center on a multiyear conspiracy to possess with intent to distribute 30-milligram tablets containing oxycodone, a Schedule II controlled substance, which resulted in charges against at least

39 defendants.[1]   Defendants D'Livro Lemat Beauchamp, Deandre Varnel Gross, Maurice Daughtry, Thomas Lee James, Jr., Naaman Rashad Jackson, Kenneth James Keith, and Shayla Denise Moorer, among others, each pled guilty to one count of conspiracy to possess with intent to distribute a controlled substance, in violation of 21 U.S.C. § 846.

In anticipation of their sentencing hearings, these seven defendants advance arguments, which the court construes as objections, that the United States Probation Office has miscalculated the weight of oxycodone attributable to each of them. While Probation counted each tablet as containing 30 milligrams of oxycodone, the defendants assert, and the government does not dispute, that the tablets at issue in this case contained "oxycodone hydrochloride"--a

_____

1. In addition to the 27 defendants indicted in these three cases, 10 defendants were indicted in *United States v. Johnson et al.*, No. 2:21-cr-374-MHT, and two were indicted in *United States v. Johnson et al.*, No. 2:21-cr-288-ECM.

salt of oxycodone that obtains 90 % of its weight (27 milligrams) from the oxycodone base and the remaining 10 % from the hydrochloride.  The upshot, according to the defendants, is that only 90 % of the weight of the oxycodone hydrochloride attributable to a given defendant should be counted toward the controlled-substance weight under United States Sentencing Guidelines Manual § 2D1.1 (U.S. Sentencing Comm'n 2021) (hereinafter "U.S.S.G.").  For a defendant whose controlled-substance weight lies near the bottom of a range in the Guideline's drug quantity table, § 2D1.1(c), this adjustment would make a difference of two levels in the determination of the base offense level.[2]

_____

    2. Although this argument implicates Probation's calculation of the controlled-substance weight for all defendants in these cases, the offense levels for most defendants are unaffected.  Some defendants pled guilty to offenses for which the base offense level is unaffected by the weight of the controlled substances involved, while others who pled guilty under 21 U.S.C. §§ 846 and 841(a)(1) have the same base offense level

The government and Probation maintain that, under § 2D1.1, the full weight of the oxycodone hydrochloride is properly considered the weight of the controlled substance.  For the reasons that follow, the court agrees that this is the correct interpretation of the guideline.  Amendment 657 to the Sentencing Guidelines, the 2003 amendment that added the language on which the defendants now rely, did not reach so broadly as the defendants read it and did not change the method of calculating drug weight in the way that the defendants assert.  Therefore, the court overrules the defendants' objections.

## I.  Background

The factual background is based principally on the presentence investigation reports and plea agreements

under either weight calculation.  Beauchamp, Gross, Daughtry, James, Jackson, Keith, and Moorer are the defendants who contend that the adjustment would, or could, affect them.

**4**

that have been received in these cases. Around 2012, Dr. Beauchamp, a physician in Montgomery, Alabama, began to write oxycodone hydrochloride prescriptions for friends in exchange for payments, often without seeing them as patients and in the absence of a legitimate medical need. This practice developed into a scheme involving participants that the government termed "fillers," who received and filled prescriptions, and "organizers," who, in addition to filling their own prescriptions, recruited other fillers and often acted as intermediaries between said fillers and Beauchamp. Approximately monthly for each filler, Beauchamp signed a prescription for 30-milligram oxycodone hydrochloride tablets (typically 90 tablets) made out to that filler. The filler would receive this prescription from either Beauchamp or an organizer. The filler would then visit a pharmacy to fill the prescription and receive the prescribed oxycodone hydrochloride tablets. Finally, he or she would give all or some of the tablets to an organizer

in exchange for monetary payment.  According to the
government's sentencing memoranda, "organizers pooled
and then sold, transferred, or bartered the collective
oxycodone tablets."  *E.g.*, Gov't's Sentencing
Memorandum (Doc. 810) at 2.

The conspiracy continued until 2020, although most
defendants did not participate during the full
eight-year period.  The defendants filled varying
numbers of prescriptions, ranging from one prescription
up to 79.  In the presentence investigation reports,
Probation calculated the drug weight attributable to
each defendant for the purpose of determining each
defendant's base offense level.  For each filler,
Probation calculated the drug weight based on the total
number of tablets obtained via prescriptions written to
that defendant.  For each organizer, Probation
calculated the drug weight by first computing the drug
weight of the tablets obtained via prescriptions
written to that defendant, as above, and then adding to

that amount the drug weights attributed to any fillers who were recruited or managed by that defendant.

## II. Legal Standard

The court's "interpretation of the Sentencing Guidelines is governed by traditional rules of statutory construction, including the prohibition on rewriting statutes by adding or subtracting words." *United States v. Shannon*, 631 F.3d 1187, 1189 (11th Cir. 2011) (citation omitted). The court "begin[s] with the language of the Guidelines, considering both the Guidelines and the commentary." *United States v. Cingari*, 952 F.3d 1301, 1308 (11th Cir. 2020) (quoting *United States v. Panfil*, 338 F.3d 1299, 1302 (11th Cir. 2003) (per curiam)). To understand this language, the court interprets the Guidelines "as if they were a statute, giving the words used their common meaning, *absent a clearly expressed manifestation of contrary intent*," *Panfil*, 338 F.3d at 1302 (ellipsis omitted), because the court must "presume that the Sentencing

7

Commission 'said what it meant and meant what it said,'" *Shannon*, 631 F.3d at 1190 (quoting *United States v. Browne*, 505 F.3d 1229, 1250 (11th Cir. 2007)).  The Sentencing Commission's commentary interpreting or explaining a guideline is "authoritative 'unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline.'" *Cingari*, 952 F.3d at 1308 (quoting *Stinson v. United States*, 508 U.S. 36, 38 (1993)).

## III. Analysis

Beauchamp, Gross, Daughtry, James, Jackson, Keith, and Moorer each pled guilty to one count of conspiracy to possess with intent to distribute a controlled substance, in violation of 21 U.S.C. § 846, so their applicable sentencing guideline is § 2D1.1.  Under § 2D1.1(a)(5), each defendant's base offense level is derived from the drug quantity table, § 2D1.1(c), which assigns a base offense level that is based on (1) drug

8

type and (2) drug quantity.   Because oxycodone is not
one of the drugs listed in the drug quantity table,
oxycodone must be converted to a standardized metric
that can be compared with other controlled substances
and that can be looked up in the drug quantity table to
determine a defendant's base offense level; this
standardized metric is called the "converted drug
weight."[3]   U.S.S.G. § 2D1.1(c) note K to Drug Quantity
Table.   The converted drug weight in a given case is
calculated by multiplying the weight of the controlled
substance attributable to a defendant by that
controlled substance's drug-specific "drug conversion"

---

3. Prior to 2018, the guideline referred to this
standardized metric as "marihuana equivalency."   In
2018, the Sentencing Commission amended the guideline
to use the term "converted drug weight" to minimize
confusion.   *See* U.S.S.G. Supp. to App. C, amend. 808
(U.S. Sentencing Comm'n 2021).   However, even after the
amendment, the converted drug weight of any controlled
substance is treated as equivalent to the identical
weight of marijuana, *i.e.*, one gram of converted drug
weight is equivalent to one gram of marijuana.   *See*
U.S.S.G. § 2D1.1 cmt. n.8(D).   Thus, marijuana remains
a useful comparator to give concrete form to the
otherwise abstract term "converted drug weight."

ratio, which is specified in application note 8(D).
U.S.S.G. § 2D1.1 cmt. n.8.  For oxycodone, this drug
conversion ratio is "1 [gram] of Oxycodone
(actual) = 6700 [grams]" of converted drug weight. *Id.*
Thus, in this case, each defendant's base offense level
is determined by (1) multiplying the weight (in grams)
of "Oxycodone (actual)" attributable to that defendant
by 6700 (the drug conversion ratio) to compute that
defendant's converted drug weight; and (2) comparing
that converted drug weight against the drug quantity
table, § 2D1.1(c), to arrive at the defendant's base
offense level.

The question presented here is what "Oxycodone
(actual)" means.  Probation calculated the amount of
actual oxycodone based on the amount of oxycodone
hydrochloride in each tablet, 30 milligrams (or 0.03
grams).  Consequently, a single tablet was equivalent
to 201 grams of converted drug weight (almost half a
pound of marijuana), which, when multiplied by the
number of tablets for which a defendant was

10

responsible, would produce the defendant's total converted drug weight.  In support of this calculation, Probation and the government rely upon application note 6 to § 2D1.1, which states, "Except as otherwise provided, any reference to a particular controlled substance in these guidelines includes all salts, isomers, all salts of isomers, and any analogue of that controlled substance."  U.S.S.G. § 2D1.1 cmt. n.6. Because oxycodone hydrochloride is a salt of oxycodone--"a substance produced by the reaction of an acid [the hydrochloride] with a base [the oxycodone]," Second Letter from Dr. Susan P. Alverson (Doc. 1035-1)--it is treated, in its entirety, as oxycodone for the purpose of the guideline, under Probation and the government's approach.

The defendants argue otherwise.  They contend that, because oxycodone is "otherwise provided" for by § 2D1.1, application note 6 is inapplicable, and any references to oxycodone in the guideline do not include its salts.  *See* Def. Moorer's Sentencing Memorandum

11

(Doc. 818) at 12–14.  As support for their position,
they point to note B to the drug quantity table: "The
terms 'Hydrocodone (actual)' and 'Oxycodone (actual)'
refer to the weight of the controlled substance,
itself, contained in the pill, capsule, or mixture."
U.S.S.G. § 2D1.1(c) note B to Drug Quantity Table.
Their argument finds some additional support in
application note 27(C), which observes that, with
respect to PCP, amphetamine, methamphetamine,
hydrocodone, and oxycodone, "the guideline itself
provides for the consideration of purity."  U.S.S.G.
§ 2D1.1 cmt. n.27(C).  According to the defendants,
this language stands for the proposition that the
weight that the hydrochloride contributes to the
oxycodone hydrochloride must be excluded from the
weight of the controlled substance.  Because oxycodone
hydrochloride derives 90 % of its weight from the
oxycodone base and 10 % from the hydrochloride, *see*
First Letter from Dr. Susan P. Alverson (Doc. 881-1),
the defendants would multiply the weight of oxycodone

12

hydrochloride in each tablet (30 milligrams) by 90 % to get the weight of "Oxycodone (actual)" in each tablet (27 milligrams).  After that, the defendants' calculation would be identical to Probation's: multiply the weight of actual oxycodone in a single tablet by the number of tablets and the drug conversion ratio (6700:1) to arrive at the converted drug weight--a converted drug weight that would be 90 % of the value that Probation calculated.

An oxycodone hydrochloride tablet is not 100 % oxycodone hydrochloride.  The bulk of its weight comes from inactive ingredients that are excluded from the weight calculation under both the defendants' calculation and Probation's.  In effect, the present dispute is whether the hydrochloride that is bonded to the oxycodone base in oxycodone hydrochloride should be excluded like these other ingredients (the defendants' argument) or included as part of the controlled substance (the government and Probation's argument).

## A.   Amendment 657

The history of the guideline's treatment of oxycodone is illuminating.   Prior to 2003, oxycodone was treated like most other controlled substances in accordance with note A to the drug quantity table: "Unless otherwise specified, the weight of the controlled substance set forth in the table refers to the entire weight of any mixture or substance containing a detectable amount of the controlled substance."   U.S.S.G. § 2D1.1(c) note A to Drug Quantity Table.   Under this approach, the weight of the controlled substance in a pill containing oxycodone was not the weight of the oxycodone (or oxycodone hydrochloride) in the pill, but the weight of the *entire* pill.   As the Sentencing Commission recognized in 2003, this approach created two types of proportionality problems: disproportionate punishments for "different medicines" and for "different amounts of oxycodone."   U.S.S.G. App. C, amend. 657 (U.S. Sentencing Comm'n 2003) ("Reason for Amendment").

14

To illustrate these problems, the Sentencing Commission highlighted two different drugs containing oxycodone: OxyContin and Percocet. OxyContin was available in the form of 135-milligram pills containing 10, 20, or 40 milligrams of oxycodone. Percocet, which mixed oxycodone with another active ingredient, acetaminophen (commonly known by the brand name Tylenol), contained only five milligrams of oxycodone but weighed approximately 550 milligrams--roughly four times the weight of an OxyContin pill. When note A to § 2D1.1(c)'s drug quantity table controlled the sentencing calculations for oxycodone, two absurdities resulted. First, an unlawful distributor of Percocet pills was held accountable for four times as much converted drug weight as an unlawful distributor of the same number of 10-milligram OxyContin pills--even though the OxyContin distributor had distributed twice as much oxycodone. Second, an unlawful distributor of 10-milligram OxyContin pills was held equally accountable as an unlawful distributor of the same

15

number of 40-milligram OxyContin pills, who had distributed four times as much oxycodone. The solution, the Sentencing Commission determined, was to treat oxycodone in accordance with note B to the drug quantity table, which was at that time applicable to only "PCP (actual)" and "Methamphetamine (actual)." U.S.S.G. § 2D1.1(c) note B to Drug Quantity Table. Accordingly, Amendment 657 to the Guidelines substituted the term "Oxycodone (actual)" for "Oxycodone" and defined "Oxycodone (actual)" to refer to "the weight of the controlled substance, itself, contained in the pill, capsule, or mixture." U.S.S.G. App. C, amend. 657. This amendment shifted the relevant factor in the controlled-substance weight calculation from the weight of the pill to the weight of the oxycodone. In passing the amendment, however, the Commission changed the conversion ratio from "1 [gram] of Oxycodone = 500 [grams] of marihuana" to "1 [gram] of Oxycodone (actual) = 6700 [grams] of

marihuana [now converted drug weight, *see supra* note 3]." *Id.*

As outlined above, the Commission's rationale initially appears to support the defendants' argument. The problem for the defendants, however, is that their argument cannot be squared with the specific choices that the Commission made.  To start, the OxyContin and Percocet pills referenced in the Reason for Amendment do not contain the stated amounts of oxycodone; they contain those amounts of oxycodone hydrochloride.  *See* Gov't's Resp. to Court Order (Doc. 881) at 9.  The Commission's use of "oxycodone" as a stand-in for oxycodone hydrochloride in the Reason for Amendment is one basis to believe that Amendment 657's reference to "Oxycodone (actual)" did not create the distinction between oxycodone hydrochloride and oxycodone that the defendants assert.

Even more concretely, the Commission stated the effect of the amendment: to create an "equivalency [that] keeps penalties for offenses involving 10

17

[milligram] OxyContin pills identical to levels that existed prior to the amendment, substantially increases penalties for all other doses of OxyContin, and decreases somewhat the penalties for offenses involving Percocet." U.S.S.G. App. C, amend. 657 ("Reason for Amendment"). Prior to the amendment, the converted drug weight of one 10-milligram OxyContin pill was the weight of the pill (approximately 135 milligrams) multiplied by the old drug conversion ratio (500:1), equaling approximately 67.5 grams of converted drug weight. After the amendment, per the argument of Probation and the government, the converted drug weight of that same pill is the weight of the oxycodone hydrochloride in the pill (10 milligrams) multiplied by the new drug conversion ratio (6700:1), equaling 67 grams of converted drug weight. This maintains the Commission's stated equivalency; the half-gram difference, though unexplained, may be attributable to the approximation of the drug weight before the amendment.

In contrast, the defendants' interpretation of the amendment breaks the equivalency.  According to the defendants, the new converted drug weight of a 10-milligram OxyContin pill is the weight of the oxycodone base in the pill (only 9 milligrams) multiplied by the new drug conversion ratio (6700:1), equaling 60.3 grams of converted drug weight.  This 7.2-gram decrease from the pre-amendment weight would represent a significant departure from the equivalency that Amendment 657 purported to maintain.

## B.  Guideline Scheme

The Sentencing Commission's rationale for Amendment 657 notwithstanding, the defendants argue that Probation's calculation of drug weight based on the full weight of oxycodone hydrochloride violates the text of note B to the drug quantity table, which instructs that actual oxycodone "refer[s] to the weight of the controlled substance, itself, contained in the pill, capsule, or mixture."  U.S.S.G. § 2D1.1(c) note B

19

to Drug Quantity Table.    However,  the  surrounding provisions  of  the  guideline  reveal  no  inconsistency. As  previously  noted,  application  note  6  states,  "**Except as  otherwise  provided,  any  reference  to  a  particular controlled  substance  in  these  guidelines  includes  all *salts*,  isomers,  all  salts  of  isomers,  and  any  analogue of  that  controlled  substance.**"    U.S.S.G.  §  2D1.1  cmt. n.6  (emphasis  added).    Reading  these  provisions together,  note  B  states  that  only  the  weight  of  the controlled  substance  counts  toward  the  converted  drug weight  of  "Oxycodone  (actual),"  and  application  note  6 states  what  counts  as  a  controlled  substance:  not  only the  "particular  controlled  substance,"  but  also  all salts,  isomers,  salts  of  isomers,  and  analogues  of  that controlled  substance.[4]

---

4.  In  the  alternative  to  their  primary  argument, the  defendants  assert  that  the  title  of  application note  6,  "Analogues  and  Controlled  Substances  Not Referenced  in  this  Guideline,"  necessarily  precludes the  note's  application  to  oxycodone  because  oxycodone is  a  controlled  substance  that  is  referenced  in  the

The defendants appear to conflate the government
and Probation's reliance on application note 6 with a
supposed reliance on note A to the drug quantity table.
The court agrees with the defendants that note A, which
states the general rule that "the entire weight of any
mixture or substance containing a detectable amount of
the controlled substance" counts toward the weight of
that controlled substance, U.S.S.G. § 2D1.1(c) note A
to Drug Quantity Table, has no application to oxycodone
in light of note B. *See, e.g.*, *United States v. Koss*,
812 F.3d 460, 468 (5th Cir. 2016) (noting that
oxycodone is among "controlled substances where the
relevant weight for purposes of calculating a
defendant's base offense level is the weight of the

---

guideline.   This argument is untenable.   The relevant
language of application note 6 specifically applies to
"any reference to a particular controlled substance in
these guidelines."   U.S.S.G. § 2D1.1 cmt. n.6.   The
title of the application note, which appears to refer
to subsequent commentary in the note, provides no basis
to distort the plain meaning and scope of this
language.

controlled substance itself, not the entire weight of the substance *and* its carrier medium"); *United States v. Landron-Class*, 696 F.3d 62, 76 (1st Cir. 2012) (contrasting oxycodone with many other drugs in that "only the weight of the active ingredient (oxycodone) is used, not the full pill weight"). But this does not support the necessary next step for the defendants, which requires that note B also supersedes application note 6 with respect to salts of oxycodone, such as oxycodone hydrochloride.

The defendants' argument for this additional step muddles § 2D1.1's distinction between a mixture and a salt. Unlike a mixture, which consists of "physically intermingled" components that can be "separated ... by physical means," a salt such as oxycodone hydrochloride is a single compound whose components are chemically bound and cannot be separated by physical means. Second Letter from Dr. Susan P. Alverson (Doc. 1035-1). Section 2D1.1 reflects this distinction between mixtures and salts by addressing them under separate

provisions and with different ramifications.   Under
notes A and B to the drug quantity table, a mixture
containing a controlled substance may or may not
contribute its weight to the converted drug weight of
that controlled substance.   However, in either case,
the mixture is not itself the controlled substance that
it contains.   In contrast, application note 6
affirmatively classifies a salt, isomer, salt of
isomer, or analogue of a controlled substance as a
controlled substance.   To say that note B prevents
other components of a "pill, capsule, or mixture"
containing oxycodone from counting toward the weight of
the controlled substance is not to say that it prevents
a chemically bound salt of oxycodone (oxycodone
hydrochloride) from contributing its entire weight to
the weight of the controlled substance, in accordance
with application note 6.

   With respect to methamphetamine, another controlled
substance that is, like oxycodone, addressed by note B
to the drug quantity table, 21 U.S.C. § 841 gives the

same effect to this distinction between a mixture and a salt.   In setting mandatory minimums for certain methamphetamine offenses, § 841 differentiates between "methamphetamine, its salts, isomers, and salts of its isomers" and "a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers."   21 U.S.C. § 841(b)(1)(A)(viii),   (b)(1)(B)(viii).   Under the statute, methamphetamine and salts of methamphetamine are treated as synonymous, whereas a mixture containing methamphetamine is given independent significance. Given that the sentencing guideline gives the term "mixture or substance" the "same meaning as in 21 U.S.C. § 841," U.S.S.G. § 2D1.1 cmt. n.1, and that the sentencing guideline addresses weight calculations for both "Methamphetamine (actual)" and "Oxycodone (actual)" under the same provision, the court discerns no basis to treat salts of methamphetamine and salts of oxycodone differently under the guideline.

24

Because Probation's calculation of the converted drug weight is consistent with both the text and structure of § 2D1.1 and the Sentencing Commission's stated rationale for Amendment 657, whereas the defendants' argument cannot be reconciled with the latter, the court concludes that Probation correctly applied § 2D1.1 by calculating each defendant's converted drug weight based on the weight of oxycodone hydrochloride.

## IV. Conclusion

In light of the Sentencing Commission's stated reason for Amendment 657 to the Sentencing Guidelines and the text and structure of § 2D1.1, Probation correctly calculated the converted drug weight attributable to each defendant based on the quantity of oxycodone hydrochloride, without the additional adjustment proposed by the defendants to factor out the weight contributed by the hydrochloride.

\*\*\*

Accordingly, it is ORDERED that defendants D'Livro Lemat Beauchamp, Deandre Varnel Gross, Maurice Daughtry, Thomas Lee James, Jr., Naaman Rashad Jackson, Kenneth James Keith, and Shayla Denise Moorer's objections to Probation Department's calculations of the converted drug weight attributable to each defendant based on the quantity of oxycodone hydrochloride are overruled.

DONE, this the 4th day of May, 2022.

/s/ Myron H. Thompson
**UNITED STATES DISTRICT JUDGE**